

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | *01* CR 108 - 2 | **DATE** | 11/7/2001 |
| **CASE TITLE** | | U.S.A. vs. Smith | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion and Order denying defendant's motion to sever his trial from Patterson's.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | number of notices | |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | |
| ✓ | Notified counsel by telephone. | NOV 0 8 2001 date docketed | 79 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| MPJ | courtroom deputy's initials | 01 NOV -7 PM 2:00 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

WILLIAM M. PATTERSON and DARYL
L. SMITH,

      Defendants.

)
)
)
)
)
)
)
)
)
)

**DOCKETED**

NOV 0 8 2001

No. 01 CR 0108

## MEMORANDUM OPINION AND ORDER

### I.

William Patterson and Daryl Smith, Chicago Police Officers assigned to the Public Housing South Division, Tactical Unit, are accused of conspiring and attempting to possess five kilograms of cocaine with intent to distribute it and to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846. Specifically, they are charged with agreeing to steal several kilograms of cocaine and a large sum of money from a purported drug dealer and turn it over to an individual cooperating with the FBI. They allegedly stole five bricks of what they thought to be cocaine, but actually was "sham cocaine," and approximately $20,000 in cash from the purported drug dealer's apartment while armed and wearing ski masks. They took the stolen goods to a grocery store parking lot where they placed the sham cocaine in the trunk of the cooperating witness' car, then took the cash to Patterson's home. The government also alleges that the defendants intentionally failed to

79

place the recovered property into the Chicago Police Department's evidence inventory, and that Patterson concealed the acts done in furtherance of the conspiracy by preparing a Supervisor's Management Log that did not disclose the property taken from the purported drug dealer's apartment. Smith moves to sever his trial from Patterson's, and I deny the motion.

## II.

Smith argues that he is entitled to a severance for three reasons: (1) Patterson made statements inculpating Smith in the course of recorded conversations with the cooperating witness ("CW"); (2) Patterson made statements inculpating Smith with regard to other crimes, which are not part of the charges in this case; and (3) Patterson has made statements exculpating Smith. Smith says that he would be prejudiced by the joinder of the cases because of the paucity of the evidence against him as compared to Patterson, and by his inability to call Patterson as a witness in a joint trial. At a minimum, Smith argues, the conspiracy charge in Count I should be severed from the other counts.

"There is a strong interest in joint trials of those who engaged in a common enterprise" because:

> [j]oint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses . . . ; [and] they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague . . . . The joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.

*United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir. 1987).
Of course, I may in my discretion grant a severance if it appears
that a defendant will be prejudiced by joinder of offenses or
defendants. Fed. R. Crim. P. 14. "In this context, 'prejudice'
does not mean that [his] odds of acquittal would [be] increased;
rather, Defendant[] must demonstrate that, absent the severance,
[he would be] unable to obtain a fair trial." *United States v.
Magana*, 118 F.3d 1173, 1186 (7th Cir. 1997).

### A.   Inculpatory statements by Patterson

Smith says that he will be prejudiced by the admission of
inculpatory statements by Patterson. *See Bruton v. United States*,
391 U.S. 123, 128-131 (1968). However, *Bruton* is predicated on the
inadmissibility of a co-defendant's statements against the moving
defendant, *id.* at 128 n.3, and the Confrontation Clause is not
implicated when inculpatory hearsay statements of co-defendants are
admitted as statements of a co-conspirator pursuant to Fed. R.
Evid. 801(d)(2)(E). *See United States v. Singleton*, 125 F.3d 1097,
1107 (7th Cir. 1997) (holding that statements properly admitted
under Rule 801(d)(2)(E) do not violate the Confrontation Clause of
the Sixth Amendment); *United States v. Buishas*, 791 F.2d 1310, 1315
(7th Cir. 1986) ("*Bruton* . . . does not require the exclusion of
statements by co-defendants made in furtherance of a conspiracy.").
Smith "does not believe the government will be able to show that he
was part of a conspiracy" and thus argues that the statements are

-3-

inadmissible against him. He contends that Patterson's statements are the only evidence against him, and that there is no independent corroborative evidence which would tend to prove the existence of a conspiracy. *See United States v. Lindemann*, 85 F.3d 1232, 1238-39 (7th Cir. 1996).

For a statement of a coconspirator to be admissible as non-hearsay under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant against whom admission is sought were members of the conspiracy, and (3) the statements were made during the course of and in furtherance of the conspiracy. *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995). In determining whether the defendant was a member of the conspiracy, I may consider the statements themselves, *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), but there must also be some corroborating evidence independent of the statements, *Lindemann*, 85 F.3d at 1238-39. To prove a conspiracy under 21 U.S.C. § 846, the

> Government [must] establish the existence of an agreement between two or more persons "for the purpose of committing, by their joint efforts, a criminal act" . . . [and] a "participatory link" between the conspiracy and the defendant. That link must be established by sufficient evidence demonstrating that the defendant knew of the conspiracy and intended to join its criminal purpose. However, unlike liability for attempt, conspiracy liability does not require evidence of an overt act by the defendant.

*United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (citations omitted).

-4-

According to the government's *Santiago* proffer, Patterson had been friends with the CW since the 1970s. Patterson confided to the CW that, several times dating back to the 1980s, he had made traffic stops of suspected drug dealers, and seized cash, usually between $3000 and $4500, but rather than arresting the suspect and inventorying the cash, Patterson kept the money and let the suspects go. Patterson had asked the CW several times if he would identify a potential ripoff target for Patterson, and he made such a request three weeks before the CW started to cooperate with the FBI in November 2000.

On January 13, 2001, the CW asked Patterson if he was still interested in ripping off a drug dealer, and Patterson said he was. The CW said that he had information from a "Mexican male" who wanted to steal money and drugs from the drug organization for which he worked. The Mexican male would set up the ripoff in exchange for some of the money and the drugs, and the balance of the cash would be divided between Patterson, the CW, Patterson's partner "Smitty,"[1] and another unidentified partner of Patterson. The CW knew "Smitty" to be Smith. Patterson agreed to the tentative plan and said he would wait for more information from the CW. That evening, there were five telephone calls between Patterson's cellular telephone and Smith's cellular telephone.

---

[1] It is not clear from the government's proffer whether Patterson or the CW mentioned Smith first.

Patterson met and spoke with the CW several times over the course of the month. At the next meeting, on January 17, 2001, Patterson said of Smith "I think . . . terror went into his heart when I started comin' up with some little suggestions, little alternatives." Earlier that day there had been six or seven telephone calls between Smith's and Patterson's cellular phones. At a meeting on January 19, Patterson and the CW discussed the plan, which was to make the apartment look like it had been raided by the police, but not to inventory the money or drugs. During the meeting, Patterson also told the CW that, earlier that day, Patterson, Smith and another CPD officer stole money and drugs and planted the drugs on a suspect at a public housing development in Chicago. The following day, there were six calls between Patterson's home telephone and Smith's cellular telephone, the longest of which lasted 28 minutes.

On January 22, Patterson spoke with the CW on the telephone and said that Smith said that the planned ripoff "looks like retirement," but that Smith balked about some of the details of the plan and asked "why can't be just be you [unintelligible] with the program?" Patterson explained that Smith said "he wants the equation [the split of the money] to be as least complicated as possible."

On January 30, there were seven calls between Patterson's home telephone and Smith's cellular telephone, one of which lasted 18

minutes, and another lasted 27 minutes. Patterson took the day off from work and bought a black duffel bag at an army/navy surplus store in Oak Forest, Illinois. On January 31, Patterson called the CW from his home telephone, and the CW asked "Smitty he say, he's all cool for tomorrow, ain't he?" Patterson responded "Oh yeah man." The CW and Patterson made plans to drop the drugs off for the Mexican male in the CW's Tahoe truck in the parking lot of the Jewel grocery store at 50th Street and Kedzie in Chicago, but to meet later to divide the cash. Immediately after the telephone call ended, there were two one-minute telephone calls from Patterson's home telephone to Smith's cellular phone. Later that night, Patterson and the CW arranged to meet in the morning to exchange the key and the address.

On the morning of February 1, Patterson and the CW met at a restaurant. Patterson explained that he was late because he had made some arrests earlier in the day and that Smith was still at the police station filling out paperwork. He said that he would go back to the station to pick up Smith and that they would bring a consent to search form with them to the apartment. The CW provided Patterson with the address and keys to an undercover FBI apartment on West 58th Street in Chicago and told him that the money and drugs would be in separate bags in the apartment.

The FBI placed the bags with the money and drugs in the apartment, and equipped the apartment with audio- and videotape

surveillance.  Patterson and Smith drove an unmarked police car to
the apartment and entered the apartment through the front door at
12:08 p.m.  Both Patterson and Smith were armed and wearing ski
masks when they entered the apartment, and they did not remove the
masks during the eight minutes that it took to search the
apartment.  Patterson used hand signals to indicate that Smith
should search a cabinet.  Patterson located the bags with the drugs
and money in kitchen cabinets and whispered, "That's it," to Smith.
Patterson and Smith then did a quick search of the apartment.
Patterson picked up the television and gently placed the television
and its stand on the floor, then tossed cushions from the couch on
the floor.  Smith picked up a lamp in the living room and gently
tilted it so that it rested on the arm of the couch.  Patterson
whispered, "Let's go."  Patterson and Smith did not speak while
they were in the apartment, except for Patterson's whispering.

Patterson and Smith left with the money and the drugs in the
black duffel bag; Patterson carried the bag.  Patterson drove, "in
a circuitous manner consistent with countersurveillance," Proffer
at 24, to the Jewel grocery store at 50th and Kedzie.  While they
were driving, a call was placed from Smith's cellular telephone to
the CW's cellular telephone, but the CW did not answer it.  At the
grocery store parking lot, Smith got out of the car and placed a
bag with the drugs in the CW's Tahoe truck.  Twenty minutes later,
the unmarked police car was seen parked outside of Patterson's

-8-

home.

Smith and Patterson were arrested by the FBI at 2:45 p.m. Patterson had in his pocket a consent-to-search form, listing the undercover apartment as the premises to be searched and Patterson and Smith as the officers conducting the search. He also had a CPD management log, which had an entry of "Info Follow-up and Recon" for the undercover apartment, but did not mention the search or evidence seized. CPD policy requires officers to inventory all drugs and money seized as soon as possible. Patterson made an oral statement after he was arrested in which he admitted to planning the theft, taking the drugs and money from the apartment, delivering the drugs to the CW's truck and hiding the money in a closet in his home. He also said that the theft was "his own responsibility and that other than Smith's involvement on [February 1], no other people at the CPD were involved with this or similar activities." Smith's Motion to Sever, Ex. 4.

Patterson's statements are admissible against him as admissions of a party-opponent under Fed. R. Evid. 801(d)(2)(A). I find that the government's evidence, if proved, would demonstrate that Patterson and the CW entered into an agreement to steal the money and drugs from the undercover apartment on January 13, 2001, and that Smith joined in the agreement. Although there can be no conspiracy between only Patterson and the CW, Patterson's statements to the CW are admissible against Smith if Smith and

Patterson conspired with one another. *See United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993). Patterson's statements indicate Smith's understanding of and willing involvement in the plan – he said that Smith was nervous about a change of plans, that Smith wanted the split of the money to be as simple as possible, and that Smith said that the plan "looks like retirement." The day before the theft, Patterson told the CW that Smith was on board. On the day of the theft, Patterson told the CW that he was going to pick up Smith.

There is sufficient corroborative evidence, if proved, independent of Patterson's statements, to demonstrate that Smith knew of the conspiracy and intended to associate himself with it. *See Stephenson*, 53 F.3d at 843. Patterson's accounts of his conversations with Smith are corroborated by the multiple phone calls between Smith's and Patterson's telephones that coincide with Patterson's conversations with the CW in the days leading up to the theft. Patterson's statement that Smith was "on board" is corroborated by Smith's presence and participation in the theft. *See United States v. Petty*, 132 F.3d 373, 380 (7th Cir. 1997).

"[A] defendant's mere knowledge of, approval of, association with, or presence at a conspiracy standing alone is insufficient to establish membership in the conspiracy." *United States v. Collins*, 966 F.2d 1214, 1220 (7th Cir. 1992). But an agreement to conspire may be demonstrated by "circumstantial evidence and reasonable

inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Larkins*, 83 F.3d 162, 166 (7th Cir. 1996). Smith entered the apartment wearing a ski mask, moved furniture in the apartment to make it look as if it had been raided or ransacked, and placed the drugs in the CW's truck in a grocery store parking lot. His participation in the theft and delivery of the goods goes "beyond mere presence," and, if proved, even without Patterson's statement, would be sufficient evidence to sustain a conviction. *See Collins*, 966 F.2d at 1220 (Cumulative circumstantial evidence of membership in conspiracy was sufficient where the defendant was present and participated in overt acts and placed and received telephone calls from key coconspirators in the days before the transaction). It is reasonable to infer that Smith, a CPD officer for ten years, would know that evidence seized, without a warrant, from a purported drug dealer's apartment should not be placed in an unlocked truck in a parking lot, and that by placing the bag in the CW's truck, Smith knowingly and intentionally joined in the criminal purpose of the plan. *See Hunte*, 196 F.3d at 691. It is also reasonable to infer that Patterson, who has admitted to planning and carrying out the theft, would not bring another CPD officer along for the ride unless that officer knew of the plan and agreed to it.

Finally, Patterson's statements implicating Smith, including

the statement on January 19 about other uncharged crimes, were made during the course and in furtherance of the conspiracy. Smith objects to the January 19 statement on two grounds: (1) the statement and the act described fall outside of the dates of the conspiracy charged, so it is inadmissible under Rule 801(d)(2)(E), and (2) even if admissible nonhearsay, the statement is inadmissible "other acts" evidence under Fed. R. Evid. 404(b).

The indictment alleges that the conspiracy began "in or about January 2001" and continued until February 1, 2001. Patterson began planning the theft with the CW on January 13, and called Smith's cellular telephone five times that evening. During the conversation on January 19, Patterson describes a theft from another drug dealer that happened "today," so the alleged act falls "squarely within the period of the alleged conspiracy." *See United States v. Mancari*, 875 F.2d 103, 106 (7th Cir. 1989). Although Smith and Patterson have not been charged with the theft described on January 19, it is reasonable to infer that Patterson's description of the January 19 theft was intended to inspire confidence and explain why Smith could be trusted. The description of the January 19 theft was therefore "in furtherance" of the conspiracy. *See Stephenson*, 53 F.3d at 845 (Statements about prior uncharged drug deals were "in furtherance" because they were made to inspire confidence.); *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (same).

Patterson's statements are nonhearsay admissions of a coconspirator under Rule 801(d)(2)(E), but to be admissible against either Smith or Patterson, the January 19 statements must also clear the hurdle of Rule 404(b). Evidence of an uncharged crime may be admissible to show "how the[] relationship began, its basis, and structure, and how the relationship blossomed into the charged conspiracy." *United States v. Zarnes*, 33 F.3d 1454, 1469 (7th Cir. 1994). The so-called "intricately related" doctrine applies where the evidence of other crimes "is 'so blended or connected' that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." *United States v. Akinrinade*, 61 F.3d 1279, 1285-86 (7th Cir. 1995). The evidence is then admissible as outside the scope of Rule 404(b). *Id.* at 1286. Here the statements explain the relationship between Smith and Patterson and explain why Patterson would have trusted Smith, another police officer sworn to uphold the law, to participate in the conspiracy. *See United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir. 1995); *Zarnes*, 33 F.3d at 1469. Based upon the government's *Santiago* proffer, I find that it is more likely than not that a conspiracy existed, that both defendants participated in the conspiracy, and that Patterson's statements were made "during the course of and in furtherance of" the conspiracy. Therefore, Patterson's statements are admissible conditionally under Rule 801(d)(2)(E)--subject to proof of the conspiracy at trial.

-13-

Accordingly, I deny Smith's request for an evidentiary hearing on the admissibility of Patterson's statements. *See United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985). Because Patterson's statements are admissible against Smith under Rules 801(d)(2)(E) and 404(b), Smith would not be prejudiced by the admission of the statements in a joint trial.

### B. Exculpatory statements by Patterson

Smith claims that his Sixth Amendment right to call witnesses on his own behalf[2] would be violated by a joint trial with Smith. Smith cannot call Patterson to the stand during a joint trial, *see United States v. Echeles*, 352 F.2d 892, 898 (7th Cir. 1965); Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 17.2(c) at 769 (2d ed. 1992) ("One defendant may not compel another defendant to testify in a joint trial."), but he says that, in a separate trial, Patterson would testify that Smith did not know of or participate in any agreement. Without evidence that Smith knowingly and intentionally agreed to participate in the crimes charged, he cannot be guilty of conspiracy, *see United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991), and therefore he argues he would be prejudiced without Patterson's testimony.

Exculpatory testimony by a co-defendant provides a basis for severance only if (1) the co-defendant's testimony would in fact be

---

[2] The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."

exculpatory, (2) the co-defendant would in fact testify, and (3) the testimony would "bear on the defendant's case." *United States v. Lopez*, 6 F.3d 1281, 1285 (7th Cir. 1993); *see also United States v. Boykins*, 9 F.3d 1278, 1289 (7th Cir. 1993). The government objected only that Smith had not provided any "independent support" for his assertion that Patterson would offer exculpatory testimony. In reply, Smith provides an affidavit of Patterson in which he says he would "be willing to testify on behalf of Smith that Smith had no knowledge of any alleged agreement between the confidential witness . . . and myself, and I never entered into any agreement regarding this incident with Smith." The government objected at oral argument that Patterson's affidavit does not specify whether he would offer testimony in a joint or separate trial. However, Smith need not "prove to a certainty that [Patterson] would be available and willing to testify in a separate trial." *United States v. Starr*, 584 F.2d 235, 239 (8th Cir. 1978). I cannot force Patterson to decide now whether he will take the stand at trial because he has an absolute right not to testify. I construe the affidavit as an offer to testify in a separate trial, and consider it sufficient to demonstrate that Patterson would testify. *See United States v. Durman*, 30 F.3d 803, 813 (7th Cir. 1994).

The government apparently does not dispute that the proffered

testimony would be exculpatory.[3]  Although Patterson's affidavit was produced in reply, it merely states that Patterson would say Smith only went along for the ride and never entered into an agreement.

Finally, I must consider whether Patterson's testimony would "bear" on Smith's case.  The Seventh Circuit has not recently construed this prong of the test, but the inquiry appears to one of materiality; that is, "what is the significance of the desired testimony to the movant's defense; *i.e.*, what is the extent of the potential prejudice to the defendant if tried without the opportunity to elicit the co-defendant's testimony?" *United States v. Harris*, 542 F.2d 1283, 1313 (7th Cir. 1976).  Smith argues that the testimony would bear on his case for the same reasons that it is exculpatory, *i.e.*, because it would demonstrate that Smith did not have the requisite knowledge to have been part of an agreement.  To say that exclusion of exculpatory testimony "bears on the defendant's case" or is prejudicial simply because it tends to exculpate the defendant would collapse the inquiries; every exclusion of exculpatory testimony would be a per se violation of the Sixth Amendment compulsory process clause.  However, the Supreme Court has held that a defendant "cannot establish a

---

[3] The proposed testimony is exculpatory, if at all, only as to the conspiracy count, however; that Smith was not part of an agreement does not bear on the weapons, attempt, or theft charges against him for his activities on February 1, 2001.

violation of his constitutional right to compulsory process clause merely by showing that [witnesses' unavailability] deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been *both material and favorable* to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (emphasis added). *See also United States v. Foote*, 920 F.2d 1395, 1399 (8th Cir. 1990) (Court must determine whether "real prejudice" would result from joinder.); *United States v. Mariscal*, 939 F.2d 884, 886 (9th Cir. 1991) ("[A] moving defendant must show more than that the offered testimony would benefit him; he must show that the co-defendant's testimony is 'substantially exculpatory' in order to succeed.").

Here, Smith says that his defense is that he "did not enter into any agreement whatsoever with Patterson." He points to the "paucity" of evidence against him, but that is not an independent ground for severance. *See United States v. Moya-Gomez*, 860 F.2d 706, 765 (7th Cir. 1988) (severance based on disparity in evidence appropriate only where it is not within jury's capacity to follow jury instructions to consider the evidence against each defendant separately). He argues that the government's only evidence against him is the testimony of Patterson, so Patterson's statement that Smith did not know of or participate in an alleged agreement between Patterson and the CW is critical. However, the government's *Santiago* proffer demonstrates that it has substantial

independent evidence: the videotape of the apartment shows that Smith went in armed and wearing a mask, that he searched the apartment with no guidance other than hand gestures from Patterson, and that he tipped a lamp over to make the apartment look as if it had been ransacked. He also delivered the bag containing the drugs to a purported drug dealer.

Patterson's proposed testimony that Smith was not part of any agreement, if believed, would tend to rebut the statements that he made to the CW about Smith's involvement, but they do not rebut the independent evidence of Smith's presence at and active participation in the theft, which, standing alone, would support a conviction. *See Collins*, 966 F.2d at 1220. Under the circumstances, Smith cannot demonstrate "real prejudice." *See Foote*, 920 F.2d at 1400 (Where court admitted co-defendant's affidavit offering to testify to defendant's innocence, and there was substantial evidence tying defendant to the conspiracy, co-defendant's testimony "would not have been sufficiently exculpatory" and defendant was not entitled to separate trial); *Mariscal*, 939 F.2d at 886 (Separate trial not warranted where "the suggested testimony would serve only to contradict one government witness, leaving other inculpatory evidence that in and of itself would be sufficient to support a conviction against [the defendant]."). *Cf. United States v. Cobb*, 185 F.3d 1193, 1198

(11th Cir. 1999) (Denial of severance motion was abuse of discretion where proposed testimony would have "flatly contradicted" eyewitness testimony that was the only evidence against the defendant.). The government need not establish that there was a formal agreement, *Larkins*, 83 F.3d at 166 (Agreement may be demonstrated by circumstantial evidence.), so testimony that Smith was not aware of an agreement or did not formally enter into an agreement is not material. The evidence of Smith's participation in the theft, without discussion and with another sworn police officer, is sufficient circumstantial evidence of his membership in a conspiracy to support a conviction, so he would not be seriously prejudiced by the inability to call Patterson in a joint trial.

I called the parties attention to the Eighth Circuit's opinion in *Foote*, where the court admitted the co-defendant's cursory affidavit, similar to Patterson's affidavit here, in a joint trial as a statement against interest under Fed. R. Evid. 804(b)(3). 920 F.2d at 1401. Neither party favors this approach. Smith asserts in his supplemental brief that he would not be permitted to use Patterson's affidavit because admission of the affidavit would be tantamount to calling Patterson to the stand, but this blurs the line between hearsay and live testimony. The affidavit is an out-of-court statement, and is admissible subject to the hearsay rules without regard to Patterson's right not to testify. Indeed, a

statement against interest is only admissible under Rule 804(b)(3) if the declarant is "unavailable"; for example, by reason of invoking the Fifth Amendment. *See United States v. Westmoreland*, 240 F.3d 618, 628 (7th Cir. 2001).

Nevertheless, Patterson's affidavit would not be admissible as a statement against interest. The government argues, and I am persuaded, that Patterson does not inculpate himself in any way in the process of exculpating Smith. It is the inculpatory nature of a statement that provides the requisite reliability for admission under Rule 804(b)(3). *See United States v. Shukri*, 207 F.3d 412, 417 (7th Cir. 2000) ("Rule 804(b)(3) embodies a judgment that statements against the declarant's interest are reliable because people do not inculpate themselves unless they are telling the truth.").

Even though the affidavit is not admissible, severance is not required. The court in *Foote* based its ruling on the "substantial evidence" tying the defendant to the conspiracy. 920 F.2d at 1400. I determine the prejudice to Smith from a joint trial by considering both the considerable evidence that the government has tying him to the conspiracy, which would be admissible in a separate trial, and the value of the evidence that he seeks to introduce in a separate trial, *viz.*, Patterson's live exculpatory testimony. I have already noted the strength of the evidence proffered by the government, and Patterson's live testimony is

worth little for the same reason that his affidavit is inadmissible: because his failure to implicate himself in the process of exculpating Smith makes it unreliable. Balanced against the considerable evidence proffered by the government, any prejudice to Smith from the inability to call Patterson at trial would be slight.

Finally, I must balance the potential prejudice to Smith against the judicial economy of joint trials. *See United States v. L'Allier*, 838 F.2d 234, 240 (7th Cir. 1988). Separate trials, even on the conspiracy count alone, would require substantial duplication of effort on behalf of the government as well as the court. Because the prejudice to Smith would be slight, the motion to sever is DENIED.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated:    November 7, 2001